1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PAUL CLOER, et al.,

                    Plaintiffs,

          v.

UNITED FOOD & COMMERCIAL
WORKERS INTERNATIONAL UNION,
et al.,

                    Defendants.

CASE NO. C05-1526JLR

ORDER

## I.  INTRODUCTION

This matter comes before the court on a motion for summary judgment from Defendants United Food and Commercial Workers International Union ("UFCW"), Geralyn Lutty, and Cynthia Bell (Dkt. # 34).  The parties have not requested oral argument. The court has considered the briefing and evidence in support thereof, and for the reasons explained below, GRANTS Defendants' motion for summary judgment.

## II.  BACKGROUND

This action arises out of Plaintiffs Pamela and Paul Cloers' employment at UFCW. UFCW has regional offices located throughout the United States and Canada; its

ORDER – 1

employees assist local unions with collective bargaining, organizing, and political efforts.
Paul Cloer is currently a UFCW Representative for Region 7, based in Bellevue,
Washington.  Prior to her retirement in January 2005, Ms. Cloer also worked as a Region
7 UFCW Representative.  As representatives, Mr. and Ms. Cloer traveled frequently,
primarily working in the field, organizing and assisting local unions.  Mr. and Ms. Cloer
married in May 2003.

The Cloers assert various claims of employment discrimination under 42 U.S.C. §
2000e, *et seq*. ("Title VII") and the Washington Law Against Discrimination ("WLAD"),
RCW § 49.60.180, 210.  Ms. Cloer alleges hostile work environment, constructive
discharge, and retaliation.  Mr. Cloer alleges marital status discrimination, hostile work
environment, sex discrimination, and retaliation.[1]

Many of the Cloers' claims derive from the allegation that UFCW failed to protect
Ms. Cloer's personal contact information and work itineraries from a threatening ex-
boyfriend, Bradford Lago.  Mr. Lago was never an UFCW employee.  Ms. Cloer dated
Mr. Lago from about 1996 until late 1999.  Detwiler Decl., Ex. A (Ms. Cloer Dep. at 5)
(R. at 5).[2]  When the relationship ended, Mr. Lago allegedly commenced stalking and
harassing Ms. Cloer, which continued for a period of nearly six years.  Ms. Cloer Decl.
¶¶ 6, 14 (Dkt. # 91)[3].  Mr. Lago's behavior allegedly included making phone calls to Ms.
Cloer and/or leaving messages featuring sexual noises, appearing at Ms. Cloer's work

---

[1]Mr. and Ms. Cloer initially filed two separate complaints against Defendants.  The court
consolidated the two cases on December 28, 2005 (Dkt. # 12).

[2]Defendants attached a lengthy record to their motion for summary judgment  (Dkt. # 34).  For
ease of reference, the court includes cites to the page of the record where available.

[3]The court cites to the corrected image of the Cloers' response (Dkt. # 91).  The Cloers fail to
number, label, or authenticate many documents attached to their reply.  While the relevance of the bulk of
these documents escapes the court, the court notes that it will not consider unauthenticated documents.  See
Canada v. Blain's Helicopters, Inc., 831 F.2d 920, 925 (9th Cir. 1987).

sites or hotels, and damaging her vehicle while she worked in the field.  See Pls.' Resp. at

11-12.  Ms. Cloer and Mr. Lago obtained protection orders against each other in 1999.

Mr. Cloer Dep. at 159-187 (R. at 20-23).  In December 1999, Mr. Lago began dating and

eventually married another UFCW employee, Wendy Thompson.[4]  The Cloers contend

that Ms. Thompson, a secretary at the regional office, leaked the Cloers' personal contact

information to Mr. Lago and that UFCW supervisors condoned this practice.  Pls.' Resp.

at 6.

The Cloers name two UFCW supervisors in their complaint, Geralyn Lutty and

Cynthia Bell.  Ms. Lutty was the Director of Region 7 from October 1, 2002 through

October 23, 2006.  Ms. Lutty had day-to-day managerial responsibility for all Region 7

employees.  Defendant Cynthia Bell was Ms. Lutty's Executive Assistant beginning

March 1, 2003.  Ms. Bell assisted in the management of Region 7 field employees,

including Mr. and Ms. Cloer.

In February 2003, Ms. Lutty learned that Ms. Cloer was not providing UFCW with

her hotel information when she worked in the field.  Lutty Decl. ¶ 36 (R. at 290-91).  Ms.

Cloer explained that she had previously been stalked by Mr. Lago and that she was

concerned that Mr. Lago would obtain her hotel information through his wife, Ms.

Thompson.  Id.  Ms. Cloer did not specify any recent acts of harassment by Mr. Lago.  Id.

Ms. Lutty told Ms. Cloer that she was required to provide an office secretary, Victoria

Hook, with her hotel information while she worked in the field.  Id.; Ms. Cloer Dep. at

198 (R. at 25).  Ms. Lutty directed Ms. Hook to keep Ms. Cloer's hotel information

confidential.  Lutty Decl. ¶ 37 (R. at 291); Hook Decl. ¶ 5 (R. at 520-1).  On or about

March 10, 2003, Ms. Lutty instructed Ms. Hook and Ms. Thompson that they were not

---

[4]Ms. Thompson and Mr. Lago were originally named Defendants in this action.  In its order of
September 27, 2006 (Dkt. # 30), the court granted a motion for judgment on the pleadings from Ms.
Thompson and Mr. Lago, resulting in the dismissal of all claims against them.

ORDER – 3

permitted to give out any personal information concerning a field employee to an unauthorized person, and further, that doing so would be grounds for termination.  Lutty Decl. ¶ 38 (R. at 291).

On May 1, 2003, Mr. and Ms. Cloer were disciplined as a result of an investigation into a sexual harassment complaint that was made by a coworker in February 2003.  Id. ¶¶ 11-13 (R. at 283-84); Perrone Decl. ¶¶ 7-8 (R. at 402).[5]  Mr. Cloer received a notice of unsatisfactory performance and Ms. Cloer received a written admonishment.  Lutty Decl. ¶¶ 11-13, Ex. A (Written Admonishment) (R. at 300); Perrone Decl., Ex. A (Notice of Unsatisfactory Performance) (R. at 404-05).  On May 1, 2003, Ms. Lutty held a disciplinary meeting with Ms. Cloer and her union representative, Castro Perez.  Lutty Decl. ¶ 39 (R. at 291).  After receiving the admonishment, Ms. Cloer informed Ms. Lutty that she had a work-related safety concern, but that she preferred Mr. Perez to discuss it privately with Ms. Lutty.  Id.  Once Ms. Cloer left the meeting, Mr. Perez informed Ms. Lutty that Ms. Cloer was receiving hang-up or threatening calls in the field; Ms. Cloer believed someone at UFCW was leaking her personal contact information to Mr. Lago.  Id.

Thereafter, Ms. Lutty met with Ms. Cloer and informed her that were an employee to be leaking such information, that it would be grounds for termination.  Id. ¶ 40 (R. at 292).  When Ms. Lutty asked Ms. Cloer for more information to support her accusations, Ms. Cloer was unable to provide any.  Ms. Cloer Dep. at 262-63 (R. at 36-37).

Ms. Lutty discussed Ms. Cloer's accusation regarding Mr. Lago with Ms. Thompson, who denied leaking any information to Mr. Lago.  Ms. Lutty emphasized that

---

[5]The coworker apparently complained that Mr. Cloer made disparaging remarks about her because she rejected his romantic advances.  She also raised a concern that, when Ms. Cloer began dating Mr. Cloer, Ms. Cloer began to undermine her work.  Neff  Decl. ¶ 4 (R. 426).

ORDER – 4

staff information should be kept confidential and that releasing such information would be grounds for termination. Lutty Decl. ¶ 41 (R. at 292); Lago Decl. ¶ 14 (R. at 528).

In April 2004, Mr. Cloer was demoted; he had previously been promoted from Representative to the position of Collective Bargaining Representative in March 2002. In Mr. Cloer's stead, UFCW promoted Edward Thompson to fill the position. Lutty Decl. ¶ 35 (R. at 290).

In a letter dated May 3, 2004, the Cloers provided Ms. Lutty with a new address, a post office box. Lutty Decl. ¶ 45, Ex. C (R. at 293, 309). They requested that UFCW include the post office box and exclude their home phone number from a field employee contact sheet due to safety concerns. Id. By letter dated May 11, 2004, Ms. Lutty agreed to list the Cloers' post office box instead of their home address, but denied the Cloers' request to remove their phone number. Lutty Decl. ¶ 48, Ex. D (R. at 294, 310). Ms. Lutty explained that the Region 7 office and local unions required phone numbers to reach Mr. and Ms. Cloer, who, as field employees, rarely came to the office. Id. Ms. Lutty suggested that they could provide cell phone or pager numbers instead of a home telephone number. Id. ¶ 49 (R. at 294).

In late May 2003, Mr. and Ms. Cloer provided Ms. Lutty with copies of petitions for protection orders that they had recently filed against Mr. Lago in state court. Lutty Decl. ¶ 43, Ex. B (R. at 293, 301-08).

In June 2003, UFCW placed Ms. Thompson on administrative and later suspended her. Id. ¶ 44 (R. at 293). Ms. Thompson allegedly provided Mr. Lago with the phone number of a UFCW employee from another regional office, whom Mr. Lago apparently hoped would testify against Mr. Cloer in the protection order proceedings. Lutty Decl. ¶ 44 (R. at 293). Shorty thereafter, on September 1, 2003, Ms. Thompson retired. Id.

ORDER – 5

In a July 28, 2003 letter, Ms. Cloer "share[d] some safety concerns with" then UFCW President Douglas H. Dority.  Ms. Cloer Dep. at 307-08, Ex. 49 (R. at 39-40, 119).  Ms. Cloer asked Mr. Dority to enforce UFCW's anti-harassment policy against Mr. Lago.  Id.  In response, Mr. Dority noted that her complaint did not appear to involve workplace harassment but that UFCW intended to investigate Ms. Cloer's allegations "to assure that any potential workplace issues [were] addressed."  Id. at 316, Ex. 50 (R. at 43, 139).  In a reply letter to Mr. Dority on September 22, 2003, Ms. Cloer identified Mr. Lago's presence at UFCW social functions and calls to hotel and union offices while she worked in the field as conduct that occurred in the workplace.  Id. at 320-21, Ex. 51 (R. at 44-45, 140-41).  She closed the letter with a statement that Ms. Thompson's recent retirement. should solve the problem, but that if it did not, she would let Mr. Doherty know.  Id.  UFCW completed its investigation into Ms. Cloer's allegations of workplace harassment and concluded that they were unfounded.  Neff Decl. ¶ 9; Ex. C (R. at 428, 501-13).

In a February 11, 2004 meeting with Ms. Lutty, Ms. Cloer raised a safety concern about having to stay at the Ramada Inn while she worked in the field.  Lutty Decl. ¶ 53 (R. at 296).  Ms. Cloer described vandalism to her car occurring at the Ramada Inn, including a scratch in August or September 2003, and drops of metallic substance on the door and roof in November 2003.  Id.  By letter dated February 16, 2004, Ms. Cloer sent Ms. Lutty a request for a "hotel exemption" because she did not feel safe at the Ramada Inn.  Id. ¶ 54 (R. at 296).  Ms. Lutty explained to Ms. Cloer that UFCW policy was to require field employees to stay at the same hotel for purposes of accessibility and communication.  Lutty Decl. ¶ 53 (R. at 296).

In April through June 2004, Mr. and Ms. Cloer complained that they had not received certain mailings from Region 7.  Lutty Decl. ¶ 56 (R. at 297).  In response, Ms.

ORDER – 6

1  Lutty instructed an employee to send Mr. and Ms. Cloer certified mail.  When Mr. and
2  Ms. Cloer complained about the certified mailings as "singling" them out, the UFCW
3  discontinued the practice.  Id., Ex. O (R. at 328).

4        In June 2004, Ms. Lutty instituted a region-wide policy requiring that employees
5  without cell phones call in to headquarters twice per day to check for messages.  Lutty
6  Decl. ¶ 52 (R. at 295)  The policy applied to all employees who had not provided the
7  office with cell phone numbers, including Mr. and Ms. Cloer.  Id.

8        On July 30, 2004, Ms. Lutty and Ms. Bell issued a memorandum to the entire
9  UFCW staff about employees' obligation to let a supervisor know if they needed to take
10  time off due to illness, doctor's appointments, or other emergencies.  Lutty Decl. ¶ 58 (R.
11  at 298).  The memorandum was prompted by Ms. Lutty's and Ms. Bell's discovery that
12  Ms. Cloer was attending doctor's appointments for four or more hours during work hours
13  without notifying her supervisors that she was leaving her field assignments.  Id.

14        By letter dated January 9, 2005, Ms. Cloer informed UFCW that she would retire
15  on January 18, 2005 based on her eligibility for early retirement.  Id. at 543-44, Ex. 146
16  (R. at 95-96, 166).

17        Defendants now move for summary judgment, arguing that the Cloers fail to
18  produce sufficient evidence to support their employment discrimination claims.

## III.  ANALYSIS

In examining a motion for summary judgment, the court must draw all inferences
from the evidence in the light most favorable to the non-moving party.  Addisu v. Fred
Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  Summary judgment is proper where
there is no genuine issue of material fact and the moving party is entitled to judgment as a
matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden to
demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477

ORDER – 7

1  U.S. 317, 323 (1986).  If the moving party meets its burden, the opposing party must

2  show that there is a genuine issue of fact.  Matsushita Elect. Indus. Co. v. Zenith Radio

3  Corp., 475 U.S. 574, 586-87 (1986).  The opposing party must present significant and

4  probative evidence to support its claim or defense.  Intel Corp. v. Hartford Accident &

5  Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).  For purely legal questions, summary

6  judgment is appropriate without deference to the non-moving party.

7  **A.      Timeliness of Claims under Title VII and the WLAD**

8          In materials submitted to the court, the Cloers refer to events occurring some years

9  ago or even fail to provide the time frame of alleged incidents.  E.g., Ms. Cloer Dep. at

10  321-25 (R. at 45-49) (identifying events in 1999, 2000, 2001); Pls.' Resp. (failing to

11  provide the year of any alleged incident).[6]  At the outset, the court notes that it rests its

12  analysis exclusively on timely allegations.

13          Under Title VII, a prerequisite to suit is that a plaintiff must pursue an

14  administrative charge with the EEOC within 300 days of the alleged unlawful employment

15  action.  42 U.S.C. § 2000e-5(e)(1).  Acts falling outside of this statutory time period are

16  generally untimely.  The exception to this rule are acts purported to support a hostile work

17  environment claim.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115-120

18  (2002) (reasoning that hostile work environment claims, unlike discrete acts of

19  discrimination or retaliation, involve repeated conduct by their very nature).  Id.  Where a

20  plaintiff alleges a hostile work environment, a court may consider any acts occurring

21  beyond the statutory limit, provided that an act contributing to the claim occurred within

22  the filing period.  Id. at 117.  The Cloers filed charges with the EEOC on December 7,

23  2004.  Ms. Cloer Dep., Ex. 1; Mr. Cloer Dep., Ex. 68 (R. at 97, 205).  With the exception

24
25
26
27
28

---

[6]Where the Cloers fail to provide the court with dates, the court relies on Defendants' unanswered
evidence of the timing of an event.

ORDER – 8

of hostile work environment claims, the court will not consider events prior to February 11, 2004 in its analysis of the Cloers' Title VII claims

There is no requirement to exhaust administrative remedies before commencing a suit under the WLAD. There is, however, a three year statute of limitations. Antonius v. King County, 103 P.3d 729, 732 (Wash. 2004). Mr. and Ms. Cloer filed their complaints in this matter on September 6, 2005; therefore, conduct occurring prior to September 6, 2002 is generally untimely under state law. Yet, state law parallels federal law in that a plaintiff may use an incident outside the limitations period to establish hostile work environment. Id. at 732-37 (adopting the Morgan Court's rationale in finding that acts, which fall outside of the statute of limitations, are properly considered by the trial court in its analysis of a hostile work environment claim). Therefore, in analyzing state law claims, with the exclusion of acts related to hostile work environment, the court does not consider conduct occurring prior to September 6, 2002.

**B.    Ms. Cloer's Hostile Work Environment Claim**

Ms. Cloer's hostile work environment claim appears to rest on her contention that her employer bears responsibility for the release of her personal information and work itineraries to Mr. Lago, thus facilitating his campaign of harassment.

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment because of . . . sex." 42 U.S.C.§ 2000e-2(a)(1).[7] Discrimination on the basis of sex may take the form of sexual harassment that reveals itself in "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature."

----

[7]For the most part, the Cloers' WLAD claims may be adjudicated along with their Title VII claims, since "decisions interpreting [Title VII] are persuasive authority for the construction of [WLAD]." Xieng v. Peoples Nat'l Bank, 844 P.2d 389, 392 (Wash. 1993). The court's references to federal law therefore apply with equal force to Mr. and Ms. Cloers' WLAD claims. Where there is a pertinent distinction between state and federal laws, the court analyzes the two laws separately.

ORDER – 9

<u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 65 (1986) (quoting EEOC Guidelines, 29 C.F.R. § 1604.11(a)(1985)).   Such claims, known as hostile work environment, arise when "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to . . . create an abusive working environment." <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993) (quoting <u>Meritor Sav. Bank</u>, 477 U.S. at 65, 67).

When the alleged harassment is carried out by a non-employee, as Ms. Cloer alleges, an employer may be liable only where it ratifies or condones the private individual's conduct by failing to investigate and remedy it after learning of it.  <u>See</u>, <u>e.g.</u>, <u>Little v. Windermere Relocation, Inc.</u>, 301 F.3d 958, 968 (9th Cir. 2002) (holding employer liable where, by "failing to take immediate and effective corrective action," it "ratified" rape of employee by potential client); <u>Folkerson v. Circus Circus Enters., Inc.</u>, 107 F.3d 754, 756 (9th Cir. 1997) ("We now hold that an employer may be held liable for sexual harassment on the part of a private individual . . . where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct.").  Once an employer knows or should have known about harassment, it is required to "undertake remedial measures reasonably calculated to end the harassment." <u>Galdamez v. Potter</u>, 415 F.3d 1015, 1024 (9th Cir. 2005) (internal quotations omitted).  In the context of third-party harassment, the reasonableness of such remedial measures depends on an employer's ability to stop the harassment and to deter potential harassers, as well as the promptness of the response.  <u>Id</u>.

Ms. Cloer fails to allege sufficient facts to hold UFCW liable for the actions of Mr. Lago, a non-employee.  There is no evidence before the court to suggest that UFCW ratified or condoned Mr. Lago's conduct.  Instead, Defendants' unanswered evidence demonstrates that once Ms. Cloer raised her safety concerns with Ms. Lutty in February 2003, Ms. Lutty took steps to ensure that Ms. Thompson – and likewise Mr. Lago – did

ORDER – 10

not have access to Ms. Cloer's information. Ms. Lutty ensured that Ms. Cloer's work

itinerary would be known only to a few UFCW employees, including herself, Ms. Bell,

and Ms. Hook. Lutty Decl. ¶¶ 37-38 (R. at 291). Ms. Lutty instructed Ms. Hook that she

should not share staff information with anyone other than Ms. Lutty and Ms. Bell. Id.;

Hook Decl. ¶ 4 (R. at 291, 520-21). Ms. Lutty further directed Ms. Thompson not to give

out any information about employees to outsiders and informed her that failing to abide by

her instruction would be grounds for termination. Lutty Decl. ¶¶ 38, 41; Lago Decl. ¶ 12

(R. at 291-92, 527-29). When UFCW learned that Ms. Thompson had provided Mr. Lago

with the contact information of another UFCW employee for his use in the protection

order proceedings, Ms. Thompson was put on administrative leave, and later suspended.

Lutty Decl. ¶ 44, Lago Decl. ¶¶ 16-17, Ex. D (R. at 294, 527-29, 546-47). Finally, Ms.

Lutty kept Ms. Cloer's travel itineraries off the office bulletin board and allowed Mr. and

Ms. Cloer to list a post office box on an employee contact sheet instead of listing their

home address. Lutty Decl. ¶¶ 45, 49, Exs. G, H; Hook Decl. ¶¶ 4-6 (R. at 313-16, 520-

21). On this evidence, no reasonable juror could conclude that Defendants condoned Mr.

Lago's alleged stalking. In addition, Ms. Lutty's actions to protect the confidentiality of

Ms. Cloer's personal information constituted reasonable corrective measures.[8]

Washington courts have adopted a slightly different approach to the question of an

employer's liability for sexual harassment by a non-employee. In DeWater v. State, 921

P.2d 1059, 1065 (Wash. 1996), the court held that the employer's ability to control the

actions of a third-party is the key inquiry in determining whether discrimination can be

imputed to the employer. Ms. Cloer fails to produce evidence to allow a reasonable juror

---

[8]Ms. Cloer contends that Ms. Lutty "undid the safety plan" to protect her personal information and
that Ms. Lutty aided Mr. Lago "in his fight against" Ms. Cloer's restraining order by leaking information
concerning Ms. Cloer's whereabouts. See Pls.' Resp. at 11. Ms. Cloer's speculation is unsupported by
any evidence before the court.

ORDER – 11

to conclude that UFCW had the ability to control Mr. Lago's allegedly intimidating behavior.  Mr. Lago has never been an employee of UFCW.  He is not a member, vendor, or otherwise affiliated with UFCW.  His sole connection to UFCW is that he dated, and then married Ms. Lutty's former secretary, Ms. Thompson.  On these facts, Ms. Cloer's claim is likewise deficient under state law

For all of these reasons, the court concludes that Ms. Cloer's allegations are insufficient to allow a reasonable juror to find Defendants liable for subjecting her to a hostile work environment.[9]

## C.    Ms. Cloer's Claim of Constructive Discharge

Ms. Cloer lists a cornucopia of allegations as bases for her constructive discharge claim, none of which amount to discriminatory working conditions.  See Detwiler Decl., Ex. C (R. at 266-78) (answers to interrogatories listing 85 reasons as bases for constructive discharge claim).

To survive summary judgment on a constructive discharge claim, Ms. Cloer must show that "there are triable issues of fact as to whether a "reasonable person in [her] position would have felt that [she] was forced to quit because of intolerable and discriminatory working conditions."  Steiner v. Showboat Operating Co., 25 F.3d 1459,

---

[9]Although the court rests its disposition on the law regarding an employer's liability for a private person's conduct, it observes that Ms. Cloer's allegations likely fail to support a finding of a hostile work environment in the first place.  Ms. Cloer's factual contentions include that Mr. Lago showed up at her hotel, damaged her company car, and made phone calls to her hotels and local union offices.  See Pls.' Resp. at 13; Ms. Cloer Dep. at 320-21, Ex. 51 (R. at at 140).  Ms. Cloer fails to provide more specific details regarding these allegations.  Ms. Cloer also identifies UFCW social functions where Mr. Lago was present, including Christmas parties, a baseball game in 2001 when he made a "scary face," and a March 2003 retirement party for a coworker when, with a "hateful" look in his eyes, Mr. Lago moved towards her. Ms. Cloer Dep. at 321-24, Ex. 4 (R. at 45-49, 104-05).  These ill-defined incidents fall below the the level of severity or pervasiveness necessary to establish a hostile work environment.  Cf. Harris v. Forklift Sys.,Inc., 510 U.S. 17, 19-24 (finding evidence that plaintiff was subjected to frequent insults because of gender and sexual innuendo, including repeated suggestion that she should retrieve coins from male supervisor's front pocket and sexual comments about clothing, was sufficient to withstand summary judgment on her hostile work environment claim).

ORDER – 12

1465 (9th Cir. 1994). "[C]onstructive discharge occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become 'sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer.'" Brooks v. City of San Mateo, 229 F.3d 917, 930 (9th Cir. 2000) (internal citations omitted). Consistent with this requirement of the heightened showing of intolerable working conditions, the Ninth Circuit has held that no constructive discharge occurs if intolerable and discriminatory working conditions cease some time before the employee quits her job. See, e.g., Steiner, 25 F.3d at 1465-66 (holding that the plaintiff failed to establish a claim for constructive discharge where she left her employer two and one-half months after the discriminatory and harassing conduct had ceased); Montero v. AGCO Corp., 192 F.3d 856, 861 (9th Cir. 1999) (dismissing plaintiff's constructive discharge claim based on her testimony that the employer's harassing behavior had ceased three to four months before she quit her job).

The court confines its analysis to the working conditions immediately preceding Ms. Cloer's retirement in January 2005. The following allegedly intolerable conditions fell within the last months of Ms. Cloer's employment: (1) UFCW sent materials by certified mail; (2) Ms. Bell and Ms. Cloer disagreed about whether Ms. Cloer asked to fly on a 5:30 flight or a 4:15 flight; (3) Ms. Cloer was required to call in twice a day; (4) Ms. Bell questioned Ms. Cloer about her massage therapy and accused Ms. Cloer of taking a two-hour lunch; (6) Ms. Cloer was forced to work longer because she had medical appointments[10]; (8) Ms. Bell questioned Ms. Cloer about her medical restriction that she

---

[10]According to UFCW's evidence, all field staff employees were expected to work at least eight hours a day, in addition to travel time from their homes. Lutty Decl. ¶ 59 (R. at 298). UFCW apparently permitted Ms. Cloer to attend doctor's appointments during normal work hours but still expected her to work an eight-hour day. Id. Ms. Cloer does not assert a disability discrimination claim.

ORDER – 13

1    only work eight hours a day including driving time; and (8) Ms. Cloer was assigned to

2    projects outside her home area.[11]  Id; Defs.' Mtn. at 10-12.

3         Most significantly, Ms. Cloer fails to produce any evidence to show that these

4    alleged working conditions or employment actions fall within the ambit of Title VII or the

5    WLAD as discrimination that is sex-based in nature.  See 42 U.S.C.§ 2000e-2(a)(1)

6    (prohibiting discrimination "because of" sex); RCW § 49.60.180 (making it an unfair

7    practice to discriminate against a person "because of . . . sex").  Without more, no

8    reasonable juror could find that Ms. Cloer was force to quit because of "discriminatory"

9    working conditions.  See Steiner, 25 F.3d at 1465.

10        Moreover, the evidence submitted by the parties reveals that Ms. Cloer's working

11   conditions were not so intolerable that a reasonable person in her position would feel

12   compelled to resign.  Ms. Cloer argues that the culmination of years of conduct finally

13   resulted in the situation becoming intolerable: "[f]or years, [Ms.] Lutty and her staff had

14   been messing with [Ms. Cloer].  Each time she would demonstrate the illegality of their

15   actions, they would simply slip into another means of getting to her.  It is no wonder she

16   had over eighty reasons for leaving."  Pls.' Resp. at 17.  Ms. Cloer fails to present any

17   legal authority to establish the viability of a constructive discharge in the absence of

18   immediate, intolerable working conditions.  Instead, Ms. Cloer contends that a reasonable

19   person in her position would have quit because her medical provider, who had "been

20   monitoring the effects of her work-related sexual harassment and retaliation for years"

21   advised her to resign for the sake of her health.  Id.  This line of argument is unavailing.

22        To meet her burden, Ms. Cloer must identify objectively intolerable discriminatory

23   working conditions.  Because Ms. Cloer fails to raise a genuine issue of material fact as to

24

25

26

27        [11]Such assignments were apparently not a new development in Ms. Cloer's career.  Evidence
28   produced by UFCW demonstrates that in the years preceding her retirement, Ms. Cloer worked outside of
     her home area over ninety percent of the time.  Lutty Decl. ¶ 60 (R. at 299).

ORDER – 14

1   constructive discharge, the court grants Defendants' motion for summary judgment on this

2   claim.

3   **D.     Mr. Cloer's Claim of Marital Status Discrimination**

4          While Mr. Cloer's complaint alludes to marital status discrimination[12], he fails to

5   support the claim with specific evidence, nor does he address it in his response to

6   Defendants' motion for summary judgment.  See Paul Cloer Compl. ¶ 10; Pls.' Resp.  Mr.

7   Cloer's ill-defined accusation fails to designate "specific facts showing that there is a

8   genuine issue for trial."  Celotex, 477 U.S. at 324.  Lacking evidentiary support, Mr.

9   Cloer's marital discrimination claim does not survive summary judgment.

10

11  **E.     Mr. Cloer's Claim of Hostile Work Environment**

12         Mr. Cloer alleges a seemingly derivative claim for the alleged sexual harassment of

13  his wife.  See Paul Cloer Compl. ¶ 10 (alleging "[c]reating and tolerating a hostile work

14  environment against the male plaintiff by allowing the spouse of one of its employees to

15  sexually harass his spouse").  As with the claim above, Mr. Cloer makes no attempt to

16  support this claim in his response to Defendants' motion for summary judgment.  See Pls.'

17  Resp.

18

19         Moreover, the court is unaware of any legal authority for the proposition that Title

20  VII or WLAD can be interpreted as creating a derivative right to maintain a claim for

21  discrimination suffered by one's spouse.  In general, a plaintiff must assert his own legal

22  right rather than rest on the right of another.  Wardin v. Seldin, 422 U.S. 490, 498 (1975).

23  Even where a female co-worker is able to frame a cognizable Title VII claim, that does not

24

25  _____

26      [12]A claim of marital status discrimination exists, if at all, exclusively under state law.  Title VII
    does not prohibit discrimination on the basis of marital status.  Costa v. Desert Palace, Inc., 268 F.3d 882,
27  888 (9th Cir. 2001), aff'd in part, rev'd in part on other grounds, 299 F.3d 838 (9th Cir. 2002), aff'd 590
    U.S. 90 (2003).  The WLAD marital status protection makes it unlawful for an employer to discriminate
28  because of "marital status."  RCW § 49.60.180(3).  "Marital status" is the legal status of being "married,
    single, separated, divorced, or widowed."  RCW § 49.60.040(7).

ORDER – 15

allow male employees "to bootstrap their job grievances . . . into an employment discrimination claim rooted in federal law."  Ruffin v. County of Los Angeles, 607 F.2d 1276, 1280-81 (9th Cir. 1979); see also Patee v. Pacific Northwest Bell Tel., 803 F.2d 476, 478 (9th Cir. 1986) ("The male workers do not claim that they have been discriminated against because they are men. . . .  [T]he male workers cannot assert the right of their female co-workers to be free from discrimination based on their sex.").

Absent a hint of evidence to suggest that Defendants subjected Mr. Cloer personally to a hostile work environment, this claim does not withstand summary judgment.

**F.     Mr. Cloer's Claim of Sex Discrimination**

Mr. Cloer alleges that he was demoted because of his sex.  See Mr. Cloer Compl. ¶ 10 (Dkt. # 1).  In March 2002, Mr. Cloer was promoted to the position of Collective Bargaining Representative.  In April 2004, he was demoted to his former position, UFCW Representative.  The bases of Mr. Cloer's claim appear to rest on his speculations that Ms. Lutty did not like men, that she was a lesbian, and that she was jealous of him because he was a heterosexual male who dated attractive women.  See Mr. Cloer Decl. at ¶ 15 (Dkt. # 91).

Mr. Cloer's allegation borders on frivolity.  To make out a prima facie case of sex discrimination, Mr. Cloer must show that he (1) was within a protected class; (2) was demoted; (3) was replaced by a person outside the protected group; and (4) was qualified to do the job.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801-02 (1973). Heterosexual men who date attractive women are not a protected class under Title VII or the WLAD.[13]  To boot, UFCW's unanswered evidence reveals that Mr. Cloer was replaced

---

[13]Nor does the court find support for Mr. Cloer's insistence that his personal fixation regarding Ms. Lutty's sexuality is relevant to his employment discrimination claim.

ORDER – 16

by Edward Thomson, another heterosexual male.  Lutty Decl. ¶ 35 (R. at 290).  The court

therefore grants Defendants' motion on Mr. Cloer's sex discrimination claim.

**G.    Claims of Retaliation**

        Finally, Mr. and Ms. Cloer allege that they suffered retaliation in violation of Title

VII and the WLAD.  Title VII prohibits employers from discriminating against an

employee because that employee "has opposed any practice made an unlawful

employment practice by this subchapter, or because he has made a charge, testified,

assisted, or participated in any manner in an investigation, proceeding, or hearing under

this subchapter."  42 U.S.C. § 2000e-3(a).[14]  To establish a prima facie case of retaliation,

a plaintiff must show: (1) that she acted to protect her Title VII rights – often referred to as

participation in a statutorily protected activity; (2) that an adverse employment action was

therefore taken against her; and (3) that a causal link exists between the two events.  Texas

Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981); see also Francom v.

Costco Wholesale Corp., 991 P.2d 1182, 1191 (Wash. Ct. App. 2000) (setting forth same

prima facie test for retaliation under WLAD).  The burden of production then shifts to the

defendant to present evidence of a "legitimate, non-retaliatory reason for the action it took

against the plaintiff."  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  The

ultimate burden lies with the plaintiff to show that the "defendant's proffered reason was a

pretext and that illegal retaliation was a motivating reason for the defendant's decision."

Id. at 804.  A plaintiff's evidence must be both specific and substantial to overcome the

legitimate reasons put forward by [the employer]."  Aragon v. Republic Silver State

Disposal, 292 F.3d 654, 659 (9th Cir. 2002).

---

        [14]Similarly, under the WLAD, "it is an unfair practice for any employer . . . to discharge, expel, or
otherwise discriminate against any person because he or she has opposed any practices forbidden by this
chapter, or because he or she has filed a charge, testified, or assisted in any proceeding under this chapter."
RCW § 49.60.210(1)

ORDER – 17

Mr. and Ms. Cloer produce a murky saga of allegedly retaliatory actions, none of which ultimately pass muster.  See Pls.' Resp. at 3-10; Ms. Cloer Dep., Ex. 4 (13-page EEOC Retaliation "Flow Chart") (R 104-16).

### 1.    Mr. Cloer's Claim of Retaliation

In regard to participation in a statutorily protected activity, Mr. Cloer states that he "participated in [Ms. Cloer's] and my own sexual discrimination charges and investigation and provided evidence of ongoing discrimination we both were experiencing." Mr. Cloer Decl. at ¶ 12 (Dkt. # 91).  He continues, "I complained to both Cynthia Bell and Geralyn Lutty about the sex discrimination against [Ms. Cloer] and myself about the continuing safety issues with Mr. Lago."  Id.

To resist summary judgment, Mr. Cloer "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  A "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence is insufficient to create a genuine issue of material fact."  FTC v. Publ'g Clearing House, 104 F.3d 1168, 1171 (9th Cir. 1997).  In addition, the court is "not required to comb the record to find some reason to deny summary judgment."  Forsberg v. Pacific N.W. Bell Tel. Co., 840 F.2d 1409, 1418 (9th Cir. 1988).

Mr. Cloer fails to augment these generalized statements with identification of a specific complaint or protestation he made to his employer before he suffered alleged retaliation.  Most critically, Mr. Cloer omits any detail as to how he participated in an investigation or provided evidence of discrimination.  This omission exacts a fatal blow to his retaliation claim.  Lacking more information, the court is not equipped to assess whether a causal connection exists between a protected activity and Mr. Cloer's April 2004 demotion or any other allegedly adverse employment action.  For these reasons, the court concludes that Mr. Cloer fails to surmount even the first prong of the prima facie test

ORDER – 18

for a retaliation claim.

### 2.     Ms. Cloer's Claim of Retaliation

Ms. Cloer likewise fails to substantiate her claim of retaliation.  Similar to Mr. Cloer's proffer, Ms. Cloer's evidence of statutorily protected activities is comprised of unspecific allegations concerning general concerns she voiced regarding her safety.  See Pls.' Resp. at 5-8.  Even so, according to evidence supplied by UFCW, Ms. Cloer arguably complained about what she perceived to be employment discrimination during her conversations with Ms. Lutty in February and May 2003 and also through her July 28, 2003 and September 22, 2003 letters to UFCW President, Mr. Dority.  Although the court is willing to construe Ms. Cloer's complaints as arguably protected activities, she fails to produce sufficient evidence for a reasonable juror to conclude that UFCW engaged in retaliation.

To survive summary judgment, Ms. Cloer must show that the allegedly retaliatory acts amounted to adverse employment action.  An "adverse employment action" is something which "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, __ U.S. __, 126 S. Ct. 2405, 2414-2415 (2006).  While "petty slights or minor annoyances" are not actionable simply because an employee has reported discrimination . . . [t]he significance of any given act of retaliation will often depend on the circumstances," with its social impact "depending on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." Id. at 2415.  "[A]n act that would be immaterial in some situations is material in others." Id. at 2416.

The allegedly adverse employment actions that Ms. Cloer identifies include: (1) a written admonishment in May 2003 following an investigation of a complaint raised by a

ORDER – 19

co-worker under UFCW's anti-harassment policy; (2) an annual evaluation on February 11, 2004 wherein Ms. Lutty gave Ms. Cloer the highest mark of "proficient" in twenty-four categories, marks of "satisfactory" in seven categories, and "needs improvement" in three categories; (3) Ms. Lutty's February 2004 refusal to allow Ms. Cloer, while working on a coordinated UFCW campaign, to stay at a different hotel from other UFCW employees; (4) Ms. Lutty's refusal to entirely remove Ms. Cloer's contact information from the field employee contact sheet[15]; (5) the requirement that field employees without a cell phone call in twice-a-day for messages; (6) the six-month practice of sending Ms. Cloer certified mail in response to her complaint that she was not receiving mail; and (7) a region-wide memorandum stating that employees were required to advise their supervisors of work absences that was prompted by Ms. Cloer's unannounced absences. See Pls.' Resp. at 5-8.[16]

The court finds that none of these incidents provides a sufficient evidentiary basis from which a reasonable juror could find an adverse employment action. First, Ms. Cloer's complaints comprise those trivial harms, ordinary tribulations, and minor annoyances that are not actionable forms of retaliation. See Burlington, 126 S.Ct. at 2415. For instance, the court cannot conceive of how UFCW's response to another employee's formal complaint of workplace discrimination would dissuade a reasonable employee from pursuing her own complaint. The Region 7 annual employee evaluation is a form of employer feedback; it is not used for promotions, job assignments, or pay raises. Lutty Decl. ¶ 62 (R. at 299). Moreover, many of the allegedly adverse employment actions

---

[15]As described above, UFCW allowed Mr. and Ms. Cloer to list a post office box on this sheet instead of their home address in response to concerns regarding Mr. Lago.

[16]Ms. Cloer's proffer consists of generally muddied allegations lacking detail; the court relies in part on uncontested evidence produced by Defendants. See Lutty Decl. ¶¶ 12, 45-62, Exs. K, L, M (R. at 284, 293-99, 322-25); Ms. Cloer Dep., Ex. 15 (R. at 117-118).

ORDER – 20

appear to constitute uniform UFCW policies.  Ms. Cloer took issue with these polices in her attempt to protect herself from a seemingly persistent and threatening ex-boyfriend. As the court previously noted in the context of its sexual harassment analysis, UFCW's responses to her requests were reasonable remedial measures.  Ms. Cloer may justifiably feel frustrated with UFCW's inability to abide by each and every one of her requests, but a failure to remedy a particular grievance is not necessarily an adverse employment action.

Finally, Ms. Cloer fails to produce a genuine issue of material fact concerning whether UFCW's reasons for its actions or policies were a pretext for retaliation.  UFCW offers legitimate business reasons for requiring that field employees stay in the same hotel, maintaining a field employee contact sheet, ensuring that employees receive their mail, requiring field employees to periodically call in, and requiring employees to advise their supervisors of anticipated absences.  See Lutty Decl. ¶¶ 45-62 (R. at 293-99).  Ms. Cloer fails to answer these explanations with evidence of pretext.

The court therefore grants Defendants' motion for summary judgment on Ms. Cloer's claim of retaliation.

## IV.  CONCLUSION

The court GRANTS Defendants UFCW, Geralyn Lutty, and Cynthia Bell's motion for summary judgment (Dkt. # 34).  This order disposes of all pending claims in this matter.  The court directs the clerk to enter judgment consistent with this order.

Dated this 22nd day of February, 2007.


_____
JAMES L. ROBART
United States District Judge

ORDER – 21